In the Supreme Court of Georgia

Decided: August 26, 2026

S25G0196.  GATEWAY PINES HAHIRA, LP v. LOWNDES
COUNTY BOARD OF TAX ASSESSORS.

COLVIN, Justice.

We granted certiorari in this case to determine whether property tax assessors seeking to determine the fair market value of "Section 42 properties" — that is, affordable housing properties that qualify for low-income housing income tax credits under Section 42 of the Internal Revenue Code ("Section 42 tax credits")[1] — may use a specific method of estimating the fair market value of real property known as the "income approach."[2] Applying the Court of Appeals'

_____

[1] See 26 USC § 42. As we have explained, "Section 42 of the Internal Revenue Code allows property owners to agree to rent to low-income tenants for below-market rates in exchange for the right to claim federal income tax credits each year for ten years." *Heron Lake II Apartments, LP v. Lowndes County Board of Tax Assessors*, 306 Ga. 816, 816 n.1 (2019).

[2] Under the income approach, a tax assessor estimates the fair market value of property based on "the present value of the projected income stream from the use of the subject property in the future." Ga. Comp. R. & Regs., r. 560-11-10-.09(4)(c).

precedent established in *Freedom Heights, LP v. Lowndes County Board of Tax Assessors*, 369 Ga. App. 725 (2023), the Court of Appeals in this case concluded that our precedent regarding OCGA § 48-5-2(3)(B)(vii)(II) (a statute that addresses how Section 42 tax credits may be considered under the income approach)[3] compelled it to conclude that, "as [Section 42 tax credits] are currently structured, tax assessors may not use the income approach in determining the fair market value of Section 42 properties." *Gateway Pines Hahira, LP v. Lowndes County Bd. of Tax Assessors*, 372 Ga. App. 705, 709, 711 (2024). As explained below, however, the Court of Appeals has misinterpreted our precedent and reached a conclusion that is inconsistent with the plain language of the statute. We therefore overrule *Freedom Heights*, reverse the judgment of the Court of Appeals in this case, and hold, consistent with our precedent and the plain language of OCGA § 48-5-

---

[3] OCGA § 48-5-2(3)(B)(vii)(II) provides that Section 42 tax credits "may be considered in determining the fair market value of [a Section 42 property]" under the income approach "provided that such income tax credits generate actual income to the record holder of title to the property."

2(3)(B)(vii)(II), that tax assessors may use the income approach when determining the fair market value of Section 42 properties, even though Section 42 tax credits, as currently structured, may not be treated as "income" under that approach.

1. By way of background, the Georgia Public Revenue Code provides that, as a general matter, "[a]ll property shall be returned for taxation at its fair market value." OCGA § 48-5-6. And the Code defines "[f]air market value of property" as "the amount a knowledgeable buyer would pay for the property and a willing seller would accept for the property at an arm's length, bona fide sale." OCGA § 48-5-2(3).

Under OCGA § 48-5-2(3)(B), tax assessors are required to consider several criteria in assessing the fair market value of real property. These criteria include, among other things, "[r]ent limitations, higher operating costs resulting from regulatory requirements imposed on the property, and any other restrictions imposed upon the property in connection with the property being eligible for [Section 42] income tax credits," OCGA § 48-5-2(3)(B)(vi),

3

as well as "[a]ny other existing factors provided by law or by rule and regulation of the [revenue] commissioner deemed pertinent in arriving at fair market value," OCGA § 48-5-2(3)(B)(viii).

Pursuant to the Public Revenue Code, the revenue commissioner has adopted a "procedural manual for use by county property appraisal staff in appraising tangible real and personal property for ad valorem tax purposes." OCGA § 48-5-269.1(a). See also Ga. Comp. R. & Regs., r. 560-11-10-.01(1) (noting that the "appraisal procedures manual" was developed pursuant to OCGA § 45-5-269.1). That manual, which is referred to as the "Appraisal Procedures Manual" and is published in Georgia's Administrative Code, explains that the "specific procedures [set out in the Manual] are designed to provide fair market value under normal circumstances," but that appraisal staff should "consider[ ]" any "unusual circumstances [that] affect[ ] value" and should "make any further valuation adjustments necessary to arrive at the fair market values" by "apply[ing] . . . generally accepted appraisal practices to the basic appraisal values required by this manual." Ga. Comp. R.

4

& Regs. 560-11-10-.01(2). And as to the appraisal of real property in particular, the Appraisal Procedures Manual requires tax assessors to follow specific guidelines set out in Rule 560-11-10-.09. See Ga. Comp. R. & Regs., r. 560-11-10-.09(1) ("The appraisal staff shall follow the provisions of this Rule when performing their appraisals of real property.").

Rule 560-11-10-.09 provides guidelines for appraising different aspects of real property, including the land itself and improvements on the land. See Ga. Comp. R. & Regs., r. 560-11-10-.09(3) ("Land valuation"); Ga. Comp. R. & Regs., r. 560-11-10-.09(4) ("Improvement valuation"). And the Rule acknowledges that tax assessors may need to use different approaches or a combination of approaches in order to ensure that "the result of any appraisal of real property . . . conform[s] to the definition of fair market value." Ga. Comp. R. & Regs., r. 560-11-10-.09(1). See Ga. Comp. R. & Regs., r. 560-11-10-.09(1)(a) ("The degree of dependence on any one approach will change with the availability of reliable data and type of property being appraised."); Ga. Comp. R. & Regs., r. 560-11-10-

5

.09(4) ("In determining the reliability and representativeness of each approach or combination of approaches, the appraisal staff shall consider those factors most likely to influence buyers and sellers when those buyers and sellers are determining exchange prices in the market place, and the sufficiency of available sales, cost, income and expense information to reliably quantify those factors. However, irrespective of the valuation approach used, the final results of any appraisal of real property by the appraisal staff shall in all instances comply with the definition of fair market value in Code section 48-5-2."); Ga. Comp. R. & Regs., r. 560-11-10-.09(5) ("Final estimate of fair market value[:] After completing all calculations, considering the information supplied by the property owner, and considering the reliability of sales, cost, income and expense information, the appraisal staff will correlate any values indicated by those approaches to value that are deemed to have been appropriate for the subject property and form their opinion of the fair market value.").

Rule 560-11-10-.09 identifies three primary approaches to

6

appraising real property, "the sales comparison, cost, and income approaches." Ga. Comp. R. & Regs., r. 560-11-10-.09(1)(a). Under the "sales comparison approach," a tax assessor "estimate[s] value by comparing the subject property to similar properties that have recently sold." Ga. Comp. R. & Regs., r. 560-11-10-.09(4)(b). Under the "cost approach," a tax assessor estimates value by "[e]stimat[ing] the cost new of the improvements, subtract[ing] accrued depreciation, and add[ing] the value of the land." Ga. Comp. R. & Regs., r. 560-11-10-.09(4)(a). Finally, under the "income approach," a tax assessor "estimate[s] value by determining the present value of the projected income stream from the use of the subject property in the future." Ga. Comp. R. & Regs., r. 560-11-10-.09(4)(c).

In addition to Rule 560-11-10-.09's guidelines, there are also statutory provisions that place limitations on how tax assessors may go about determining the fair market value of real property. See, e.g., OCGA § 48-5-2(3) (requiring tax assessors who are "determining the fair market value of income-producing property" to "consider[ ]" the "income approach, if data are available"). And as

7

relevant here, we addressed two such limitations in *Heron Lake II Apartments, L.P. v. Lowndes County Board of Tax Assessors*, 299 Ga. 598 (2016) ("*Heron Lake One*"), and *Heron Lake II Apartments, LP v. Lowndes County Board of Tax Assessors*, 306 Ga. 816 (2019) ("*Heron Lake Two*"), both of which concerned ad valorem taxation of Section 42 properties.

In *Heron Lake One*, we addressed the constitutionality of OCGA § 48-5-2(3)(B.1), which expressly prohibited tax assessors from considering Section 42 tax credits in determining the fair market value of Section 42 properties.[4] See *Heron Lake One*, 299 Ga. at 598. We held that the statute violated Article VII, Section I, Paragraph III(a) of Georgia's 1983 Constitution ("the taxation uniformity provision")[5] because Section 42 tax credits "are part and

---

[4] See OCGA § 48-5-2(3)(B.1) ("The tax assessor shall not consider any income tax credits with respect to real property which are claimed and granted pursuant to either Section 42 of the Internal Revenue Code of 1986, as amended, or Chapter 7 of this title in determining the fair market value of real property.").

[5] That provision states: "Except as otherwise provided in subparagraphs (b), (c), (d), (e), (f), and (h) of this Paragraph, all taxation shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax." Ga. Const. of 1983, Art. VII, Sec. I, Par. III(a). See also Ga. Const. of

8

parcel of the tangible real estate [that] may properly contribute to an assessment of fair market value," and, thus, by entirely prohibiting tax assessors from considering such tax credits, the statute created an unconstitutional subclass of tangible property subject to preferential treatment for ad valorem tax purposes. Id. at 609–10 (quotation marks omitted).[6]

Following *Heron Lake One*, the General Assembly amended OCGA § 48-5-2 to include limitations on tax assessors' use of certain methods for determining the fair market value of Section 42 properties. See *Heron Lake Two*, 306 Ga. at 818, 821. As relevant here, the General Assembly imposed a new limitation on how tax assessors could use the income approach when determining the fair market value of Section 42 properties. See id. Specifically, the General Assembly passed a new statutory provision, OCGA § 48-5-

1983, Art. VII, Sec. I, Par. III(b)(1) ("Except as otherwise provided in this subparagraph (b), classes of subjects for taxation of property shall consist of tangible property and one or more classes of intangible personal property including money[.]").

[6] Although *Heron Lake One* declared "OCGA § 48-5-2(3)(B.1) unconstitutional for violating the Georgia Constitution's taxation uniformity provision[,] . . . subsection (B.1) still appears in the Georgia Code." *Heron Lake Two*, 306 Ga. at 817 n.3.

9

2(3)(B)(vii)(II), which provides:

> In establishing the value of any property subject to rent restrictions under the income approach, any income tax credits described in division (vi) of this subparagraph that are attributable to property [including Section 42 tax credits] may be considered in determining the fair market value of the property, provided that such income tax credits generate actual income to the record holder of title to the property[.]

In *Heron Lake Two*, we interpreted this provision and held that it does not violate the Georgia Constitution's taxation uniformity provision. See *Heron Lake Two*, 306 Ga. at 821–28. And as explained below, our interpretation of OCGA § 48-5-2(3)(B)(vii)(II) in *Heron Lake Two* is the genesis of the dispute giving rise to this appeal.

2. In this case, Gateway Pines Hahira, LP ("Taxpayer"), which owns a Section 42 affordable housing apartment complex in Lowndes County, challenges a tax assessment notice issued by the Lowndes County Board of Tax Assessors ("the Assessors"). The notice stated that the fair market value of Taxpayer's Section 42 property for the 2018 tax year was $5,363,682. Although Taxpayer challenged the Assessors' fair-market-value determination, the

10

Assessors made no change to that determination. Taxpayer then appealed the assessment directly to the superior court, under OCGA § 48-5-311(g).

As relevant here, the Assessors filed a motion for partial summary judgment in the trial court, and the trial court granted the motion, concluding in relevant part that, under *Heron Lake Two*, "the income approach is inapplicable and may not be used based on the current structure of the tax credits[,] which does not provide any actual income to the taxpayer."[7]

The Court of Appeals affirmed, concluding that the case was controlled by its prior decision in *Freedom Heights*, 369 Ga. App. 725, which had "considered the same issue." *Gateway Pines Hahira*, 372 Ga. App. at 709. See *White v. State*, 305 Ga. 111, 121 (2019) (holding that panels of the Court of Appeals are bound to follow earlier decisions of that court "until such time as the older law was properly overruled by that court or reversed or overruled by this

---

[7] Although the Assessors filed two summary judgment motions, seeking partial summary judgment on a number of issues, the trial court's rulings as to the other grounds for partial summary judgment are not at issue here.

Court"). Specifically, as in *Freedom Heights*, the Court of Appeals in this case concluded that,

> [a]s construed by the Supreme Court [in *Heron Lake Two*] in favor of its constitutionality, OCGA § 48-5-2(3)(B)(vii)(II) limits the applicability of the income approach to circumstances where a tax assessor could show that [Section 42 tax credits] generate actual income. And, as currently structured, [Section 42 tax credits] do not constitute actual income for the purposes of OCGA § 48-5-2(3)(B)(vii)(II). Consequently, as [Section 42 tax credits] are currently structured, tax assessors may not use the income approach in determining the fair market value of Section 42 properties.

*Gateway Pines Hahira*, 372 Ga. App. at 711 (citations and punctuation omitted). See *Freedom Heights*, 369 Ga. App. at 730 (same). We granted certiorari to determine whether "tax assessors [are] permitted to use the income approach to determine the fair market value of a property with low-income housing tax credits," in light of OCGA § 48-5-2(3)(B)(vii)(II) and *Heron Lake Two*.

3. We answer the certiorari question in the affirmative: in accordance with OCGA § 48-5-2(3)(B)(vii)(II) and *Heron Lake Two*, tax assessors may use the income approach to determine the fair market value of Section 42 properties, although OCGA § 48-5-

12

2(3)(B)(vii)(II) imposes a limitation on *how* tax assessors may do so. As explained below, contrary to the Court of Appeals' opinion in this case and the precedent on which it relied, *Heron Lake Two* did not construe OCGA § 48-5-2(3)(B)(vii)(II) as prohibiting tax assessors from *using the income approach* when determining the fair market value of Section 42 properties but instead as prohibiting tax assessors from *treating Section 42 tax credits as income* (unless they lead to actual income) when using the income approach to assess the fair market value of Section 42 properties. And the plain language of OCGA § 48-5-2(3)(B)(vii)(II) permits use of the income approach even when Section 42 tax credits cannot be considered under that approach.

In *Heron Lake Two*, the trial court concluded that OCGA § 48-5-2(3)(B)(vii)(II) would violate the Georgia Constitution's taxation uniformity provision unless it permitted tax assessors to consider Section 42 tax credits as "actual income" under the income approach. See *Heron Lake Two*, 306 Ga. at 819. And the trial court therefore applied the doctrine of constitutional avoidance to construe the

13

statute as permitting "[Section 42 tax credits to] be considered 'actual income' under OCGA § 48-5-2(3)(B)(vii)(II)'s income approach." Id. On appeal, we reversed, concluding that the statute could not be so construed, and that the statute did not violate the taxation uniformity provision when properly construed. See id. at 816.

As we explained, OCGA § 48-5-2(3)(B)(vii)(II) "define[s] the contours" of "the income approach" by "tell[ing] tax assessors *how* they can use the . . . income approach[ ] in determining the fair market value of Section 42 properties." *Heron Lake Two*, 306 Ga. at 821, 824 (emphasis added). Relying on the statute's "plain text," we explained that OCGA § 48-5-2(3)(B)(vii)(II) provides that, "*when* establishing the fair market value of Section 42 properties under the income approach, tax assessors may consider [Section 42 tax credits] attributable to those properties" only if "the [Section 42 tax credits] 'generate actual income to the record holder of title.'" Id. at 821 (emphasis added; citation omitted). And we held that, "as currently structured," "[Section 42 tax credits] cannot be counted as 'actual

14

income' under the income approach" because they do not generate "more money" for recipients of the tax credits — that is, Section 42 tax credits "do not constitute 'income'" or "provide recipients of those credits with 'actual income'" — but "merely reduce [the recipient's] overall tax burden" by allowing the recipient to "pay less in taxes to the government." Id. at 821–22, 827 (citations and emphasis omitted).

Turning to the constitutional question, we concluded that OCGA § 48-5-2(3)(B)(vii)(II) does not "place[ ] [Section 42] properties in a distinct subclass of property for taxation purposes" and therefore does not violate the Georgia Constitution's taxation uniformity provision. *Heron Lake Two*, 306 Ga. at 824–25. This is so, we explained, "because [the statutory provision] does not altogether preclude tax assessors from considering [Section 42 tax credits] as part of the fair market value of Section 42 properties." Id. at 825. Instead, we explained, OCGA § 48-5-2(3)(B)(vii)(II) "simply limit[s] the applicability of the . . . income approach[ ]" by prohibiting tax assessors from "count[ing] [Section 42 tax credits] as

15

'actual income' under the income approach" unless "a tax assessor c[an] show that [Section 42 tax credits] 'generate actual income.'" Id. at 827. We noted that the statutory "method" of counting Section 42 tax credits as "actual income" under the income approach "has a narrow range of potential applications" because "today's [Section 42 tax credits]" do not constitute "actual income" or "generate actual income." Id. But we concluded that the General Assembly had reasonably imposed such a limitation on use of the income approach because the income approach, which focuses on the projected income stream from use of the property, could only "be accurately and fairly applied" to Section 42 tax credits "based on reliable data" in "situations" where "a tax assessor could show that [Section 42 tax credits in fact] 'generate actual income.'" Id. And we noted that OCGA § 48-5-2(3)(B)(vii)(II)'s prohibition on considering Section 42 tax credits, as currently structured, when applying the income approach did not prohibit tax assessors from considering Section 42 tax credits as contributing to the fair market value of Section 42 properties. See id. at 827–28. We explained that this is because "tax

16

assessors are not limited to using" a specific valuation approach and are instead "direct[ed] . . . to consider" a variety of different approaches, some of which may account for any value added to a property by Section 42 tax credits better than others; and because, "irrespective of the valuation approach used," tax assessors are directed to take steps to account for any "unusual circumstances" affecting fair market value that remain unaccounted for under those approaches (e.g., Section 42 tax credits) to ensure that "the result of any appraisal of real property . . . conform[s] to the definition of fair market value." Id. (citations and punctuation omitted).

As this description of *Heron Lake Two* shows, the Court of Appeals in *Freedom Heights* erred in concluding that we "construed" OCGA § 48-5-2(3)(B)(vii)(II) "in favor of its constitutionality" to "limit[ ] the applicability of the income approach to circumstances where a tax assessor could show that [Section 42 tax credits] generate actual income." *Freedom Heights*, 369 Ga. App. at 730 (quotation marks omitted). See also *Gateway Pines Hahira*, 372 Ga. App. at 711 (same). The Court of Appeals' interpretation of *Heron*

17

*Lake Two* in *Freedom Heights* was incorrect in two respects.

First, although the Court of Appeals accurately observed that *Heron Lake Two* referenced the doctrine of constitutional avoidance as a general principle of law, see *Heron Lake Two*, 306 Ga. at 825 ("[W]e have long held that if the language of an act is susceptible of a construction that is constitutional, and another that would be unconstitutional, that meaning or construction will be applied which will sustain the act." (quotation marks omitted)), we did not rely on that legal principle when construing OCGA § 48-5-2(3)(B)(vii)(II). Instead, we construed OCGA § 48-5-2(3)(B)(vii)(II) according to its "plain text." *Heron Lake Two*, 306 Ga. at 821–22. By its plain terms, OCGA § 48-5-2(3)(B)(vii)(II) does not address the circumstances under which *the income approach* may be considered in determining the fair market value of Section 42 properties but instead the circumstances under which Section 42 "*income tax credits . . .* may be considered in determining the fair market value" of Section 42 properties "under the income approach." OCGA § 48-5-2(3)(B)(vii)(II) (emphasis added). That is precisely what we said in

18

*Heron Lake Two.* See *Heron Lake Two*, 306 Ga. at 821 (stating, based on the plain language of the statute, that "OCGA § 48-5-2(3)(B)(vii)(II) provides that, when establishing the fair market value of Section 42 properties under the income approach, tax assessors may consider [Section 42 tax credits] attributable to those properties, 'provided that' the LIHTCs 'generate actual income to the record holder of title.'" (punctuation omitted)).

Moreover, we had no occasion to apply the doctrine of constitutional avoidance because the "plain text" of OCGA § 48-5-2(3)(B)(vii)(II) did not violate the Georgia Constitution. *Heron Lake Two*, 306 Ga. at 819, 821, 825 (rejecting the trial court's application of the doctrine of constitutional avoidance when interpreting the statute). As we explained, the plain language of OCGA § 48-5-2(3)(B)(vii)(II) merely places a limitation on when Section 42 tax credits can be counted as income under the income approach, while allowing tax assessors to consider any contribution Section 42 tax credits make to the fair market value of a particular property in other ways. See id. at 827–28. And because OCGA § 48-5-

2(3)(B)(vii)(II) does not "*completely exempt* [Section 42 tax credits] from an assessor's consideration," like the statute at issue in *Heron Lake One*, we concluded that OCGA § 48-5-2(3)(B)(vii)(II) does not violate the Georgia Constitution's taxation uniformity provision. Id. at 824–25.

Second, in concluding that *Heron Lake Two* prevented any use of the income approach to determine the fair market value of Section 42 properties, *Freedom Heights* placed undue emphasis on isolated statements from our opinion, which only appear ambiguous when divorced from the context in which they appear. Specifically, the Court of Appeals appears to have focused on our statements that OCGA § 48-5-2(3)(B)(vii)(II) "limit[s] the applicability of the . . . income approach[ ]," and that OCGA § 48-5-2(3)(B)(vii)(II)'s "method has a narrow range of potential applications." *Heron Lake Two*, 306 Ga. at 827. But when read in the context of the opinion as a whole, as outlined above, it is clear that we did not hold that OCGA § 48-5-2(3)(B)(vii)(II) places a limitation on *whether* tax assessors can use the income approach to determine the fair market value of Section

20

42 properties, but instead that the statute places a limitation on "*how*" tax assessors can use the income approach "*when* establishing the fair market value of Section 42 properties under the income approach." Id. at 821 (emphasis added). As described above, we concluded that OCGA § 48-5-2(3)(B)(vii)(II) "limit[s] the applicability" of the income approach by providing that, "*when* establishing the fair market value of Section 42 properties under the income approach," "[Section 42 tax credits] can[] be counted as 'actual income'" only "in circumstances where a tax assessor c[an] show that [Section 42 tax credits] 'generate actual income.'" Id. at 821, 827 (emphasis added). And we said that the "method" of counting Section 42 tax credits as actual income has "a narrow range of potential applications" because Section 42 tax credits generally do not constitute "actual income" or "generate actual income," and because Section 42 tax credits do not constitute "actual income" or "generate actual income" "as currently structured." Id. at 827.

The Court of Appeals in *Freedom Heights* therefore erred in concluding that, "as [Section 42 tax credits] are currently structured,

21

tax assessors may not use the income approach in determining the fair market value of Section 42 properties." *Freedom Heights*, 369 Ga. App. at 730. And as a result, the Court of Appeals in this case, which followed *Freedom Heights* as it was bound to do, likewise erred. See *Gateway Pines Hahira*, 372 Ga. App. at 711. Accordingly, we overrule *Freedom Heights*, reverse the judgment of the Court of Appeals in this case, and remand the case for further proceedings consistent with this opinion.

*Judgment reversed and case remanded. All the Justices concur.*